IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DUSTIN SULLIVAN,                        §
TDCJ No. 2458560,                       §
                                        §
            Plaintiff,                  §
                                        §
V.                                      §        No. 3:22-cv-1162-S-BN
                                        §
DALLAS COUNTY SHERIFF'S                 §
DEPARTMENT, ET AL.,                     §
                                        §
            Defendants.                 §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Plaintiff Dustin Sullivan, then an inmate at the Dallas County jail (who is now

a Texas prisoner), filed a *pro se* civil rights complaint raising various claims related

to his detention at the jail. *See* Dkt. No. 3, 12-14, 17, 18, 26, & 29.

The presiding United States district judge referred Sullivan's lawsuit to the

undersigned United States magistrate judge for pretrial management under 28

U.S.C. § 636(b) and a standing order of reference.

And Defendants Geronimo Garcia, Martin Nicholson, Emmanuel Hooks,

Charles Peterson, Terry Speight, and Mariama Smith, LVN answered, all asserting

qualified immunity. *See* Dkt. No. 15, ¶ 2.2; Dkt. No. 38, ¶ 2.1; Dkt. No. 39, ¶ 2.1; Dkt.

No. 40, ¶ 2.1; & Dkt. No. 43, ¶ 12.

As ordered, Defendants moved for summary judgment on qualified immunity.

*See* Dkt. Nos. 48, 50, 51, & 63-65. Also as ordered, *see* Dkt. Nos. 67-69 & 71-76,

Sullivan moved for leave to conduct limited discovery in order to respond to the

qualified immunity issues raised in the summary judgment motions. *See* Dkt. No. 77. And Defendants responded. *See* Dkt. Nos. 79 & 80.

The Court granted in part and denied in part Sullivan's motion to the extent that the discovery that Defendants Garcia, Nicholson, Hooks, Peterson, and Speight agreed to provide or respond to was authorized by the Court. *See* Dkt. No. 80 at 5-9 & Dkt. No. 81.

And counsel for the responding defendants advised the Court that discovery was provided to Sullivan on September 22, 2023, in care of the warden at the Texas Department of Criminal Justice's Beto Unit, *see* Dkt. No. 84.

The Court then set set October 26, 2023 as Sullivan's deadline to respond to Defendants' motions for summary judgment on qualified immunity. *See* Dkt. No. 85. The Court twice extended the response deadline – to January 16, 2024 – on Sullivans's motions. *See* Dkt. Nos. 87, 88, 90, & 91. The Court extended that deadline a third time, granting Sullivan's motion in part. *See* Dkt. Nos. 92 & 93.

Sullivan filed responses in May 2024. *See* Dkt. Nos. 94 & 95.

Defendants then replied later that month. *See* Dkt. Nos. 96-98.

And the undersigned now enters these findings of fact, conclusions of law, and recommendation that the Court should enter a final judgment granting the motions for summary judgment on qualified immunity, dismissing the claims against Defendants Garcia, Nicholson, Hooks, Peterson, Speight, and Smith with prejudice, and dismissing with prejudice, under its screening authority, the claims against Defendants Dallas County Sheriff's Department ("DCSD") and Detective Moffit.

**Preliminary Considerations: Screening**

Before considering qualified immunity, the undersigned first identifies the operative complaint. While Sullivan filed one complaint [Dkt. No. 3], he later moved to amend the complaint (multiple times) solely to identify unnamed defendants, as the Court explained in an order entered on October 12, 2022:

> The Court granted Sullivan's motion for leave to proceed *in forma pauperis* under the Prison Litigation Reform Act (the "PLRA"), *see* Dkt. No. 8, and ordered his complaint served on the two individual defendants identified by name: Officers Nicholson and Garcia, both alleged to be jailers employed by the Dallas County Sheriff's Department, *see* Dkt. Nos. 9-11.
>
> After that, Sullivan moved to amend his complaint to identify Doe defendants and to provide the first names for Officers Nicholson and Garcia. *See* Dkt. Nos. 12-14. Officers Nicholson and Garcia then answered, *see* Dkt. No. 15, each asserting, as affirmative defenses, that he is entitled to qualified immunity ("QI") and that Sullivan failed to exhaust administrative remedies under the PLRA, *see id.*, ¶¶ 2.1, 2.2. And, on September 8, 2022, the Court granted Sullivan's motion to amend and ordered Nicholson and Garcia to move for summary judgment on either or both defenses by October 10, 2022. *See* Dkt. No. 17.
>
> After that, Sullivan filed two more motions to amend, identifying additional Doe defendants. *See* Dkt. Nos. 18, 26. Sullivan also moved the Court to appoint him counsel. *See* Dkt. No. 19. And Nicholson and Garcia moved to extend their deadline to move for summary judgment on QI, explaining that, after further investigation, they "will not file a dispositive motion on their PLRA exhaustion defenses." Dkt. Nos. 27, 28.
>
> The Court must resolve QI on an expedited basis, engaging in this analysis on an individualized basis.
>
> So, given the current posture of this proceeding, where now it is clearer that PLRA exhaustion may not be case dispositive, the Court GRANTS Sullivan's additional motions to amend [Dkt. Nos. 18, 26] and recognizes that he has named the following defendants: Geronimo Garcia and Martin Nicholson (who were served, answered, and asserted QI) and Emanuel Hooks, Charles Peterson, Jonathan Garcia, Sgt. Speight, and Mariama Smith (who have not but who plausibly are also all jail employees who may assert QI).
>
> The Court also GRANTS Geronimo Garcia and Martin

Nicholson's motion for extension as amended [Dkt. Nos. 27, 28] to the extent that the Court ABATES the September 8 order (and the deadline to move for summary judgment on QI) to allow defense counsel an opportunity to investigate this matter further considering the additional named defendants.

The Court therefore ORDERS defense counsel to file a status report by November 11, 2022, to inform the Court whether service may be waived as to the additional named defendants and to provide the Court his views on an expedited consideration of qualified immunity as to all defendants named in this action.

Dkt. No. 29 (cleaned up).

A status report was filed. *See* Dkt. No. 30.

And the Court eventually received answers from all the individual defendants identified with the use of force incidents and the medical care that Sullivan received after the force incident, all of whom asserted qualified immunity in their answers, so the Court ordered those defendants to move for summary judgment as to that defense on December 14, 2022. *See, e.g.*, Dkt. No. 48.

But that leaves two defendants named in the complaint not before the Court: DCSD and Moffit.

As to each, the Court may consider Sullivan's claims under its screening authority, *see* 28 U.S.C. §§ 1915(e)(2) & 1915A(b), which empowers the Court to dismiss – at any time – a complaint or any portion of a complaint that fails to state a claim on which relief may be granted.

Under these standards, a complaint need not contain detailed factual allegations, but it must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And, so, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up; quoting *Twombly*, 550 U.S. at 557).

Starting with Moffit, Sullivan alleges that he unconstitutionally retaliated against him by placing him in administrative segregation: "Detective Moffit retaliated against me and violated my due process by placing me in administrative custody for being a victim and reporting the assault." Dkt. No. 3 at 6 ("Once I filed the complaint I was moved to lockup and restricted from my tablet use, my T.V. privileges, video visits or the right to use law library on the kiosk.").

> Claims of retaliation by prison inmates are viewed with skepticism, lest the federal courts potentially embroil themselves in every adverse action that occurs within a penal institution. Accordingly, to prevail on a claim of retaliation, a prisoner must establish (1) that he was exercising or attempting to exercise a specific constitutional right, (2) that the defendant intentionally retaliated against the prisoner for the exercise of that right, (3) that an adverse retaliatory action, greater than *de minimis*, was undertaken against the prisoner by the defendant, and (4) that there was causation, *i.e.*, that "but for" the retaliatory motive, the adverse action would not have occurred. To pass the *de minimis* standard for a retaliatory act, a plaintiff must allege an adverse act that "is capable of deterring a person of ordinary firmness from further exercising his constitutional rights."

*Mack v. LeBlanc*, Civ. A. No. 20-444-JWD-EWD, 2021 WL 6199494, at *4 (M.D. La. Nov. 15, 2021) (footnotes omitted).

And the facts alleged by Sullivan do not advance a retaliation claim over the line from probable to plausible.

First, the few facts do not allow for a reasonable inference that, but for an improper motive, Sullivan would not have been placed in administrative segregation.

Sullivan also alleges only temporary inconveniences based on his alleged transfer to administrative segregation and thus fails to allege a more than *de minimis* – or more than inconsequential – act to support the retaliation claim. *See, e.g.*, *Morris v. Powell*, 449 F.3d 682, 687 (5th Cir. 2006) (Prison job "transfers may have had a retaliatory motive, and Morris may have experienced discomfort for a few days as a result, but there is no evidence that the job transfers were more than de minimis." But "[t]here is no doubt that transfer to a more dangerous prison as a penalty for the exercise of constitutional rights has the potential to deter the inmate from the future exercise of those rights.").

Next, to the extent that Sullivan has named DSCD itself as a defendant, courts in this circuit dismiss claims against non-jural entities, which are commonly servient political departments such as a local law enforcement entity. *See, e.g.*, *Combs v. City of Dall.*, 289 F. App'x 684, 686 (5th Cir. 2008) (per curiam) (affirming dismissal of "the DPD as a defendant because it is a servient political department that does not enjoy a separate and distinct legal existence from the City of Dallas," as the plaintiff failed to "show that the City of Dallas granted the DPD the capacity to sue or be sued as a separate and distinct entity" (citing *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 313-14 (5th Cir. 1991) ("[U]nless the true political entity has taken explicit steps to grant the servient agency with jural authority, the agency cannot engage in any litigation except in concert with the government itself."))).

Nor should the Court liberally construe Sullivan's suing DCSD – based on a single incident (alleged acts against him) – as asserting plausible claims against

Dallas County or the Dallas County Sheriff (neither explicitly named as a defendant). *See, e.g.*, *Johnson v. Harris Cnty.*, 83 F.4th 941, 947 (5th Cir. 2023) ("Johnson's claim against the county fails because she does not plausibly allege *any* pattern of conduct – much less a pattern of similar violations." (emphasis in original)); *Culbertson v. Lykos*, 790 F.3d 608, 629 (5th Cir. 2015) (Allegations, "limited to the events surrounding the plaintiff" cannot constitute "an allegation of a *de facto* policy … by the County."); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017) (per curiam) ("Supervisory officials are accountable for their own acts of deliberate indifference and for implementing unconstitutional policies that causally result in injury to the plaintiff." (citing *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992))).

The Court should therefore dismiss any claims against Moffit and DCSD under Sections 1915(e)(2) and 1915A(b).

### Qualified Immunity: Legal Standards

"A plaintiff makes out a § 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting under color of state law.'" *Rich v. Palko*, 920 F.3d 288, 293-94 (5th Cir. 2019) (cleaned up; quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)).

"But government officials performing discretionary duties" can respond to such a claim by asserting qualified immunity. *Rich*, 920 F.3d at 294 (citing *Haverda v. Hays Cnty.*, 723 F.3d 586, 598 (5th Cir. 2013)).

And, if they do, a court must consider each official's actions separately, *see*

*Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007), on an expedited basis, *see Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021), "because qualified immunity is 'not simply immunity from monetary liability' but also 'immunity from having to stand trial,'" *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (quoting *Westfall v. Luna*, 903 F.3d 534, 542 (5th Cir. 2018)).

"[T]he doctrine of qualified immunity attempts to balance two competing societal interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

"These interests are distilled into a legal standard, an affirmative defense, that shields public officials sued in their individual capacities 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Phrased differently, this immunity "attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

The doctrine therefore "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per

curiam) (cleaned up; quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *accord City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015).

"Accordingly, 'qualified immunity represents the norm,' and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting, in turn, *Harlow*, 457 U.S. at 807)); *but see, e.g., Jamison v. McClendon*, 476 F. Supp. 3d 386 (S.D. Miss. 2020) (calling for reconsideration of the doctrine); *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., statement respecting denial of cert.) (calling on his colleagues to, "in an appropriate case … reconsider either our one-size-fits-all test or the judicial doctrine of qualified immunity more generally"); *Gonzalez v. Trevino*, 42 F.4th 487, 507 (5th Cir. 2022) (Oldham, J., dissenting) (suggesting that officers who do not make split-second decisions "should not get the same qualified-immunity benefits that cops on the beat might get"), *majority decision vacated & remanded*, 144 S. Ct. 1663 (2024).

The "qualified-immunity inquiry is two-pronged." *Cunningham v. Castloo*, 983 F.3d 185, 190 (5th Cir. 2020) (citing *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020)):

- Do "the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right"? *Id.* at 190-91 (citing *Garcia*, 957 F.3d at 600).

- Was "the right at issue … 'clearly established' at the time of the alleged misconduct"? *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (quoting *Pearson*, 555 U.S. at 232).

"In order for a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right.'" *Ramirez*, 3 F.4th at 133 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"The reasonableness of the official's conduct and the degree to which the particular right in question was clearly established are thus merged into one issue for purposes of the qualified immunity analysis." *Id.* at 133-34; *cf. Nerio v. Evans*, 974 F.3d 571, 575 (5th Cir. 2020) ("Fair notice requires clearly established law. That is, the law must 'clearly prohibit the officer's conduct in the particular circumstances before him' so 'every reasonable official' knows not to engage in that conduct." (quoting *D.C. v. Wesby*, 583 U.S. 48, 63 (2018); citing *al-Kidd*, 563 U.S. at 742)).

Under this standard, "[q]ualified immunity is justified unless no reasonable officer could have acted as [the defendant officers] did [given the same facts], or every reasonable officer faced with the same facts would not have [acted as the defendant officers did]." *Tucker v. City of Shreveport*, 998 F.3d 165, 174 (5th Cir. 2021) (quoting *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019) (internal quotation marks omitted; citing, in turn, *Wesby*, 583 U.S. at 63 ("It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that 'every reasonable official' would know."))).

A court may "analyze the prongs in either order or resolve the case on a single prong." *Cunningham*, 983 F.3d at 191 (quoting *Garcia*, 957 F.3d at 600 (internal quotation marks omitted)).

Even so, addressing this affirmative defense on a motion for summary

judgment is not exactly intuitive.

"A plaintiff suing for a constitutional violation has the ultimate burden to show that the defendant violated a constitutional right … whether or not qualified immunity is involved." *Joseph*, 981 F.3d at 329 (footnote omitted).

But, "[w]hen a public official makes 'a good-faith assertion of qualified immunity,' that 'alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available.'" *Id.* at 329-30 (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016)); *accord Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021) ("The defense of qualified immunity 'alters the usual summary judgment burden of proof.' Once a defendant properly raises the defense, the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to the defense's protection." (citations omitted)).

"In other words, to shift the burden to the plaintiff, the public official need not show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law." *Joseph*, 981 F.3d at 330 (citing *King v. Handorf*, 821 F.3d 650, 653-54 (5th Cir. 2016)).

Once shifted, "the plaintiff bears the burden of demonstrating that a defendant is not entitled to qualified immunity." *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019) (per curiam) (citation omitted).

And, "[t]o rebut [a public official's] qualified immunity defense, [a] p]laintiff[] must point to summary judgment evidence '(1) that [the official] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was

'clearly established at the time.'" *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (citations omitted).

And, so, as to the first prong of the qualified-immunity inquiry, to overcome a public official's motion for summary judgment on qualified immunity, the plaintiff "must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury" – just as would be required "if the plaintiff did not face qualified immunity." *Joseph*, 981 F.3d at 330.

That is, the plaintiff must defeat summary judgment by showing that "the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right," *Cunningham*, 983 F.3d at 190-91.

And, when considering this showing, the Court must "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004).

Particularly applicable in *pro se* cases, "verified complaint[s] and other verified pleadings serve as competent summary judgment evidence." *Falcon v. Holly*, 480 F. App'x 325, 326 (5th Cir. 2012) (per curiam) (citing *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003)); *see, e.g.*, *Mitchell v. Cervantes*, 453 F. App'x 475, 477-78 (5th Cir. 2011) (per curiam).

But if "the [evidence] … offer[ed] in opposition to summary judgment is neither sworn nor declared under penalty of perjury to be true and correct, it is not competent

evidence." *Smith v. Palafox*, 728 F. App'x 270, 274 (5th. Cir. 2018) (per curiam) (cleaned up; quoting *Davis v. Fernandez*, 798 F.3d 290, 292 (5th Cir. 2015); citation omitted).

And the Court need not accept "'the plaintiff's version of the facts,'" if "that version 'is blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Joseph*, 981 F.3d at 325 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007); citing *Orr*, 844 F.3d at 590).

For example, the Court must "assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011) (citing, in turn, *Scott*, 550 U.S. 372)).

In sum, "[w]hen one party's description of the facts is discredited by the record, [a court] need not take his word for it but should view 'the facts in the light depicted by the videotape.'" *Id.* (quoting *Scott*, 550 U.S. at 380-81); *accord Joseph*, 981 F.3d at 325 (Where a court "proceed[s] through the facts in detail, including the disputed facts, considering each officer's actions independently," it "draw[s] these facts from the record, prioritizing the video evidence." (footnotes omitted)); *see also Garcia v. Orta*, 47 F.4th 343, 350-51 & n.2 (5th Cir. 2022) (discussing the scope of *Scott*, including that its holding reaches beyond video evidence, to similar items in "the record" "capable of utterly discrediting the plaintiff's version of the facts" – including still photos, taser logs, and "what can be heard, and not just what can be seen, on a video" (citations omitted)); *but cf. Spiller v. Harris Cnty., Tex.*, 113 F.4th 573, 580-81

(5th Cir. 2024) (Willett, J., concurring) ("And while such evidence can sharpen our decision-making by leaving less room for speculation and guesswork, it can often raise as many questions as it answers… And even what the often-harrowing video does show can become a Rorschach test of sorts, as viewers filter objective evidence through subjective experience. Where some see damning digital proof, others see clear-cut exoneration…. As best I can tell, the majority's description is largely faithful to what the evidence shows in light of the allegations made. But after reading the dissent, one can only wonder how we can reach such polar-opposite conclusions from the same video. [In sum, d]escribing video footage is tricky.").

That's just the first prong: "[T]he plaintiff's version of [the] disputed facts [supported by proper summary judgment evidence and not blatantly contradicted by the record] must also constitute a violation of clearly established law." *Joseph*, 981 F.3d at 330. That is, "when qualified immunity is involved, at least in this circuit, a plaintiff has the additional burden to show that the violated right was 'clearly established' at the time of the alleged violation." *Id.* at 329 (footnote omitted).

And the clearly established question can be "a doozy." *Morrow*, 917 F.3d at 874. That is, "[t]he 'clearly established' prong is difficult to satisfy." *Cunningham*, 983 F.3d at 191; *cf. Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) ("We are bound by the restrictive analysis of 'clearly established' set forth in numerous [United States] Supreme Court precedents.").

"In order for a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right.'" *Ramirez*, 3 F.4th at 133 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"The reasonableness of the official's conduct and the degree to which the particular right in question was clearly established are thus merged into one issue for purposes of the qualified immunity analysis." *Id.* at 133-34.

And the plaintiff "must show that the law was 'sufficiently clear' at that time 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *Batyukova*, 994 F.3d at 726 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

"There are two ways to demonstrate clearly established law" and meet this additional burden to make this second showing. *Id.*

Typically, the plaintiff must "'identify a case' – usually, a 'body of relevant case law' – in which 'an officer acting under similar circumstances was held to have violated the Constitution.'" *Joseph*, 981 F.3d at 330 (cleaned up); *accord Wigginton v. Jones*, 964 F.3d 329, 335 (5th Cir. 2020) (A clearly established right must be supported by "controlling authority – or a 'robust consensus of [cases of] persuasive authority' – that defines the contours of the right in question with a high degree of particularity." (quoting *Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011))); *see, e.g.*, *Lincoln v. Turner*, 874 F.3d 833, 850 (5th Cir. 2017) ("While we may look to other circuits to find clearly established law, we must consider 'the overall weight' of such authority. A 'trend' alone is just that. As of December 2013, only two circuits had weighed in on the 'contours of the right.' These cases alone do not provide sufficient authority to find that the law was clearly established." (footnote omitted)).

"It is the plaintiff's burden to find a case in her favor that does not define the law at a high level of generality." *Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 (5th Cir. 2018) (cleaned up; quoting *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018)). Thus, the "clearly established law" "must be 'particularized' to the facts of the case." *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021) (cleaned up). And a clearly established right must be defined "with specificity." *Cunningham*, 983 F.3d at 191 (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (per curiam)).

"The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (citations omitted).

"In other words, 'there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." *Cunningham*, 983 F.3d at 191 (quoting *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)).

In sum, under the most common approach to this prong, while the "clearly established right … must be particularized to the facts of the case establishing the right," *Harris v. Clay Cnty., Miss.*, 47 F.4th 271, 277 (5th Cir. 2022) (cleaned up), because "[t]he touchstone of the inquiry is 'fair notice," "[d]istinctions between cases are thus relevant only if they make the applicability of prior precedent unclear," *Boyd*

*v. McNamara*, 74 F.4th 662, 669 (5th Cir. 2023) (citations omitted).

That is, "[a] plaintiff need not show that the very action in question has previously been held unlawful. The test is whether every reasonable official would know that their actions are unconstitutional. [And, so, a]t the end of the day, [what is absolutely necessary] is fair warning." *Stevenson v. Tocé*, 113 F.4th 494, 504 (5th Cir. 2024) (cleaned up).

Under the second approach to demonstrating clearly established law, a plaintiff asks the Court to look to "the 'rare' possibility that, in an 'obvious case,' analogous case law 'is not needed' because 'the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Joseph*, 981 F.3d at 330 (quoting *Wesby*, 583 U.S. at 64); *accord Batyukova*, 994 F.3d at 726.

"[I]n an obvious case, general standards can [therefore] 'clearly establish' the answer, even without a body of relevant case law." *Roque*, 993 F.3d at 335 (cleaned up; quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

But "[t]he standard for obviousness is sky high." *Joseph*, 981 F.3d at 338.

And, so, "plaintiffs are only excused of their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious,'" *Cope*, 3 F.4th at 206 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020) (per curiam)), because qualified immunity should "not immunize those officials who commit novel, but patently 'obvious,' violations of the Constitution," *Tyson v. Sabine*, 42 F.4th 508, 520 (5th Cir. 2022) (quoting *Hope v. Pelzer*, 536 U.S. 730, 745 (2002)); *see, e.g., Harris*, 47

F.4th at 279 ("Detaining Harris for more than six years after he should have been released under Supreme Court precedent and a state court order is a violation of clearly established law. Qualified immunity thus does not protect Huffman and Scott."); *Tyson*, 42 F.3d at 520 ("It is obvious that the right to bodily integrity forbids a law enforcement officer from sexually abusing a person by coercing them to perform nonconsensual physical sex acts for his enjoyment").

### Qualified Immunity: Analysis

Responding to the summary judgment motions, Sullivan failed to present the Court with relevant case law particularized to the facts here – and thus has done nothing, on his own, to defeat qualified immunity's clearly established prong.

The Court must therefore determine whether there were any *obvious* violations of clearly established federal law based on the evidence that supports Sullivan's best version of the disputed facts not otherwise utterly discredited or blatantly contradicted by the record.

That's generally a heavy burden. And, under the circumstance here, it is one that Sullivan has not met. And, so, for the reasons set out below, the Court should grant the motions for summary judgment on qualified immunity.

The undersigned starts with the Officers.

At the time that the alleged events occurred – in November 2021 – Sullivan was a pretrial detainee. "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Alderson*, 848 F.3d at 419. And, "[i]n *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court outlined the proper analytical

framework for adjudicating a pretrial detainee's excessive force claim." *Acosta v. Williamson Cnty., Tex.*, No. 23-50777, 2024 WL 3833303, at *4 (5th Cir. Aug. 15, 2024) (per curiam).

> In sum, a Fourteenth Amendment excessive force inquiry under *Kingsley* has two steps. At step one, courts must determine whether the defendant's use of force was deliberate. If the use of force was deliberate, then at step two, courts must determine whether the defendant's use of force was objectively reasonable, considering the specific circumstances of the case.

*Id.* at *5.

And, so, "[a]s a pretrial detainee, [Sullivan] 'can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.'" *Sanchez v. Griffis*, No. 21-51160, 2023 WL 7984732, at *1 (5th Cir. Nov. 17, 2023) (per curiam) (quoting *Kingsley*, 576 U.S. at 398).

"Factors relevant to a determination of reasonableness include the relationship between the need for the use of force and the amount of force used, efforts to temper or to limit force, the threat reasonably perceived by the officer, the extent of the plaintiff's injury, and whether the plaintiff was resisting." *Id.* (citation omitted).

Through a verified complaint, Sullivan alleges that two separate uses of force were excessive.

In the first, Sullivan alleges that Nicholson "repeatedly chest bumped me and pushed me in my chest area while in the visitation hallway on the 2nd floor" and that, "[w]hile pushing and chest bumping me [Nicholson] continued to threaten me, telling me I wasn't as tough as I thought I was," and "repeatedly asked me if I wanted to

fight." Dkt. No. 3 at 4-5.

The second allegedly occurred after Sullivan was ordered to gather his belongings because he was being moved. According to Sullivan,

> Garcia reminded me there was no way out of my ass whoopin stating that the officers will always stick together. At that point he pulled out his mace and sprayed me continuously. After ordering me to the floor I attempted to kneel but was sprayed with more gas while I was facing the wall and walking away from the conflict I was punched by Officer Garcia in my head and was thrown to the ground where … I was punched and kicked by over 10 officers. Officer Peterson began yelling the assault was enough and for other officers to stop the assault but the assault resumed for another 40 seconds or so. During the assault I lost consciousness twice. After punching and kicking me I was dragged to my feet by my hair and pulled into the dayroom where my hair continued to be pulled. I was forced chest first into a table with a knee in my back that prevented me from breathing.

*Id.* at 5.

The analysis that follows turns on two things: the evidence submitted by Sullivan and what the video recordings of each use of force shows (or does not show).

As set out above, Sullivan's initial filing in this case – the complaint – is verified, through an Unsworn Declaration in which Sullivan "declare[s] under penalty of perjury that the above and forgoing is true and correct." Dkt. No. 3 at 8-9. And Sullivan filed undated witness statements concerning interactions between Sullivan and Nicholson submitted by two fellow Dallas jail inmates, both sworn under penalty of perjury. *See* Dkt. No. 62.

But none of Sullivan's filings liberally construed as amending the complaint (to name then unidentified defendants) are verified. *See* Dkt. Nos. 12-14, 18, & 26. Nor did Sullivan submit evidence in support of his opposition to the summary judgment motions. *See* Dkt. Nos. 94 & 95.

Still, allegations that are sworn to be correct under penalty of perjury will count as competent summary judgment evidence. *See Hart*, 343 F.3d at 765; *Stewart v. Guzman*, 555 F. App'x 425, 431-32 (5th Cir. 2014) (per curiam) ("[T]he district court erroneously found the unsworn affidavits Stewart proffered as well as the factual allegations in Stewart's complaint to be inadequate summary judgment evidence. While unsworn affidavits are usually insufficient to raise a genuine issue of material fact, *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 382 n.2 (5th Cir. 2013), an 'unsworn declaration ... in writing of [a] person which is subscribed by him, as true under penalty of perjury and dated' may substitute for a sworn declaration. 28 U.S.C. § 1746. Stewart attached a signed declaration to his complaint, stating that, 'under the penalty of perjury,' the facts alleged in his complaint were 'true and correct.' Moreover, Stewart relied on his two unsworn declarations and multiple unsworn affidavits from fellow inmates, which contained declarations that they were 'true under penalty of perjury[ ] and dated.' Therefore, we will consider the facts Stewart alleges in his verified complaint, his two unsworn declarations, as well as the unsworn affidavits when determining whether he raised a genuine issue of material fact." (citations omitted)).

But Sullivan's best version of the disputed facts supported by evidence also must not be "utterly discredited" or "blatantly contradicted" by the video recordings. *Scott*, 550 U.S. at 380.

Even so, "*Scott* was not an invitation for trial courts to abandon the standard principles of summary judgment by making credibility determinations or otherwise

weighing the parties' opposing evidence against each other any time a video is introduced into evidence." *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021) (citing *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 730 (5th Cir. 2018)).

"Rather, *Scott* was an exceptional case with an extremely limited holding" – "Only when the record eliminates any feasible claim that the nonmovant's account of events is true may a court disregard the normal summary judgment rule that it must credit that party's account if it is supported by sufficient evidence," which "is a difficult and demanding standard." *Id.* at 410-11 (cleaned up).

For example, where a video does not capture "every particular element of [an] altercation" it would not necessarily "blatantly contradict [a plaintiff's] version of the facts" supported by evidence. *Ramirez v. Martinez*, 716 F.3d 369, 374-75 (5th Cir. 2013) ("Martinez asserts we must disregard Ramirez's version of events on summary judgment because the video shows Ramirez tried to punch him. Although the video shows the struggle described above, it does not clearly show a punch or every particular element of the altercation.").

Starting with the first alleged use of force here, Sullivan swears that Nicholson "repeatedly chest bumped me and pushed me in my chest area while in the visitation hallway on the 2nd floor." Dkt. No. 3 at 4. But the surveillance camera footage of this incident, which lacks audio, captures the entire physical altercation between Sullivan and Nicholson in the hallway and reflects that the two circled each other and that each was in the other's face, but the video does not depict physical contact between the two that was more than slight, so that, while their chests may have touched, there

were neither repeated chest bumps nor a push in the chest before two other jailers separate the two. *See* Dkt. No. 64-1, Appx. 001, Jail surveillance video 2P10, at 2:40-3:10. Nor do the sworn statements from Sullivan's fellow inmates offer details that refute or otherwise call into question the video depiction of this force incident.

And, so, Sullivan has not shown that his version of this event supported by evidence that is not contradicted by the record reflects an *obviously* unconstitutional excessive use of force under the standards established by *Kingsley*.

Put another way, properly considering the evidence at summary judgment objectively, Sullivan fails to demonstrate "that a governmental action [was] not rationally related to a legitimate governmental objective" or "that [such an action was] excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398.

Turning to the second alleged use of force, the undersigned starts with what Sullivan swears happened, keeping in mind that the Court must consider each officer's actions separately. *See Meadours*, 483 F.3d at 421-22. And, under this requirement – and even though Sullivan was allowed discovery before responding to the summary judgment motion – the only evidence that he offers as to this incident (his verified complaint) identifies only two officers: Garcia and Peterson. *See* Dkt. No. 3 at 5.

Sullivan swears that Garcia "pulled out his mace and sprayed me continuously. After ordering me to the floor I attempted to kneel but was sprayed with more gas while I was facing the wall and walking away from the conflict I was punched by Officer Garcia in my head and was thrown to the ground." *Id.* While, as Sullivan also

swears, Peterson yelled "for other officers to stop the assault." *Id.*

Although the defendants have offered video footage of this force incident from two separate angles, *see* Dkt. No. 64-1, Appx. 002 & 003, Jail surveillance video 2P08-2P13, the surveillance videos do not clearly capture what occurred inside the cell, such that "contrary video evidence provides so much clarity that a reasonable jury could not believe [Sullivan's] account," *Darden*, 880 F.3d at 730 (citing *Ramirez*, 716 F.3d at 374).

And, while other events depicted on the videos do blatantly contradict other details of what Sullivan swears occurred – in particular, that he was "pulled into the dayroom where my hair continued to be pulled" and that he "was forced chest first into a table with a knee in [his] back," Dkt. No. 3 at 5; *see* Dkt. No. 64-1, Appx. 002, Jail surveillance video 2P08-2P13 at 15:00-17:00 – to use these depictions to reject Sullivan's evidence not blatantly contradicted by video footage would amount to "making credibility determinations," which, even if *Scott* applied to this force incident, it would not allow. *Aguirre*, 995 F.3d at 410.

And, so, Sullivan's best version of this event supported by evidence that is not contradicted by the record is that one officer (Garcia) "punched [Sullivan] in [his] head" while Sullivan was "walking away from the conflict" and that Garcia also "sprayed [Sullivan] with more gas while [he] was facing the wall, while another officer (Peterson) yelled "for other officers to stop the assault." Dkt. No. 3 at 5.

This evidence, viewed objectively, could, with additional context, demonstrate governmental actions "not rationally related to a legitimate governmental objective"

or actions "excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398. But, even with a fuller context, that would only meet one prong of the qualified immunity standard.

And, as to this allegedly excessive force, Sullivan fails to offer the Court any authority as to the second prong, to show that, if his verified allegations support a violation of federal law, there was a violation of clearly established law.

"[T]he question whether an officer has used excessive force 'requires careful attention to the facts and circumstances of each particular case,'" *Kisela v. Hughes*, 584 U.S. 100, 103 (2018) (per curiam) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Accordingly, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396).

"And '[t]he calculus of reasonableness must embody allowance for the fact that [law enforcement] officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 396-97).

And, so, "overcoming qualified immunity is especially difficult in excessive-force cases" – "an area of the law in which the result depends very much on the facts of each case, and thus [law enforcement] officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Morrow*, 917

F.3d at 876 (cleaned up); *cf. Henderson v. Harris Cnty., Tex.*, 51 F.4th 125, 132 (5th Cir. 2022) (per curiam) (concluding that the fair notice "hurdle is even higher when the plaintiff alleges a Fourth Amendment violation"); *Perry v. Mendoza*, 83 F.4th 313, 319 (5th Cir. 2023) ("Especially when evaluating qualified immunity in the Fourth Amendment context, we look for precedent that squarely governs the specific facts at issue." (cleaned up)).

Still, "[n]o doubt 'obvious' excessive force cases can arise. But they are so rare that the Supreme Court has never identified one in the context of excessive force." *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1167 (5th Cir. 2021) (footnote omitted); *cf. Salazar v. Molina*, 37 F.4th 278, 286 (5th Cir. 2022) ("By citing no factually similar Supreme Court cases, Salazar effectively concedes that Supreme Court precedent offers him no help. He turns instead to Fifth Circuit excessive-force cases. Even on the assumption that Fifth Circuit precedent can create clearly established law, none of Salazar's cases is a close enough fit." (citation omitted)).

And, here, the skeletal facts that Sullivan offers to support his version of the second force incident make this case particularly ill-suited to breaking new legal ground by recognizing that those facts show an *obvious* excessive force violation. Instead, Sullivan's burden as to the fair notice prong – one that he has not carried – was to show that "existing precedent squarely governs the specific facts at issue." *Morrow*, 917 F.3d at 876.

And, so, the Court should conclude that all the Officers are entitled to summary judgment on qualified immunity and dismiss the claims against them with prejudice.

The undersigned turns finally to Nurse Smith.

As to the medical attention that he received at the jail following the second force incident, Sullivan swears that he was initially "denied" "medical attention." Dkt. No. 3 at 5 ("I was then escorted to the nurse on the 2nd floor where no aid was given. I repeatedly told the nurse I blacked out and had a pounding headache, cuts and lesions.").

But Sullivan then swears that he was taken "back to medical where they took pictures, cleaned blood from my busted head and documented my injuries" and that, the next day, after complaining of a concussion, he was taken to the hospital. *Id.*

As such, even if the Court accepts this version as what happened, such that Nurse Smith was on duty each time that Sullivan was taken to medical, Sullivan has not shown that Nurse Smith committed a clearly established violation of federal law.

Following *Kingsley*, "this circuit has continued to apply a subjective deliberate indifference standard in non-excessive-force actions alleging a violation of a pretrial detainee's constitutional rights based on episodic acts or omissions." *Cope v. Coleman Cnty.*, No. 23-10414, 2024 WL 3177781, at *5 n.7 (5th Cir. June 26, 2024) (per curiam) (citing *Alderson*, 848 F.3d at 419 & n.4).

And, so, "[w]here the claimed violation of [a] Fourteenth Amendment right turns on alleged acts or omissions of an official, as in this action, the question is whether the 'official breached his constitutional duty to tend to the basic human needs of persons in his charge.'" *Edmiston v. Borrego*, 75 F.4th 551, 558 (5th Cir. 2023) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 645 (5th Cir. 1996) (en banc)).

"[T]o satisfy this high standard, plaintiff must [show] both that the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that he also drew the inference. An official with such knowledge shows a deliberate indifference to that risk by failing to take reasonable measures to abate it." *Id.* at 559 (cleaned up).

And deliberate indifference "'is an extremely high standard to meet' but can be satisfied by a 'wanton disregard for [an inmate's] serious medical needs.'" *Cope*, 3 F.4th at 207 (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)).

Put another way, "[d]eliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *Alvarez v. City of Brownsville*, 904 F.3d 382, 391 (5th Cir. 2018) (en banc); *accord James v. Harris Cnty.*, 577 F.3d 612, 617-18 (5th Cir. 2009); *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992); *see also Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021) ("[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm. Rather, the plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." (cleaned up)).

And, alone, a disagreement with medical treatment or a failure to provide additional medical treatment does not constitute deliberate indifference. *See Domino*,

239 F.3d at 756; *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

Applying these standards to the evidence supporting Sullivan's best version of the disputed facts supporting a claim against Nurse Smith, he has not shown an *obvious* violation of federal law – again, Sullivan offers no case law to clearly establish a constitutional violation specific to the deliberate indifference that he swears to.

And, so, because Sullivan fails to offer any evidence that the jail wantonly disregarded a serious medical need, even based on his best version of the disputed facts, the Court should conclude that Nurse Smith is entitled to summary judgment on qualified immunity and dismiss the claims against her with prejudice.

## Recommendation

The Court should enter a final judgment granting the motions for summary judgment on qualified immunity [Dkt. Nos. 50 & 63], dismissing the claims against Defendants Geronimo Garcia, Martin Nicholson, Emmanuel Hooks, Charles Peterson, Terry Speight, and Mariama Smith, LVN with prejudice, and dismissing with prejudice, under its screening authority, the claims against the Defendants Dallas County Sheriff's Department and Detective Moffit.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and

specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: October 7, 2024

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE